UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

|  |  |  |
|---|---|---|
| UNITED STATES OF AMERICA | * * * | |
| v. | * * | |
| PAUL M. WEADICK, | * * | Criminal Action No. 16-cr-10258-ADB |
| Defendant. | * * * * * | |

**MEMORANDUM AND ORDER**

BURROUGHS, D.J.

Paul M. Weadick ("Petitioner") was sentenced to life in prison after a jury, following a twenty-three-day trial, convicted him of murdering a witness, Steven DiSarro ("DiSarro"), to prevent DiSarro from talking to federal agents about organized crime activities. [ECF No. 282]. Currently pending before the Court is Petitioner's pro se petition to vacate his sentence, pursuant to 28 U.S.C. § 2255. [ECF No. 422 ("Petition")]. The Government opposes, and requests summary dismissal of the Petition. [ECF No. 432 ("Opp.")]. For the reasons stated below, the Petition is **DENIED**.

I.   **BACKGROUND**

   A.   **Factual Background**

On September 1, 2016, Petitioner was indicted for murder of a witness under 18 U.S.C. § 1512(a)(1)(C). [ECF No. 16]. After being indicted, Petitioner originally retained the services of attorney Carmine Lepore. [ECF No. 27]; see also [Petition at 4]. Less than a month later, however, Petitioner replaced Lepore with attorney William D. Crowe. [ECF No. 42]; see also [Petition at 5]. After Petitioner exhausted his available funds to pay Crowe's legal fees, and

1

needing further assistance with the case, Crowe petitioned the Court ex parte to appoint CJA co-counsel, [ECF No. 142], and the Court appointed Mark W. Shea on March 21, 2018, [ECF No. 145]. Both attorneys represented Petitioner throughout the trial. [ECF Nos. 327, 329, 418–19].

Petitioner's trial began before this Court on April 24, 2018. [ECF No. 348]. Over the course of the twenty-three-day trial, the Government presented a number of witnesses to establish Petitioner's participation in the murder.[1] Of particular importance, this included Steve Flemmi ("Flemmi"), who testified that, on May 10, 1993, he witnessed Frank Salemme, Jr. ("Frank Jr.") strangling DiSarro while Petitioner held DiSarro's legs. [ECF No. 370 at 28:7–14]. Flemmi's testimony was further corroborated by Robert DeLuca ("DeLuca"), who testified that Frank Salemme, Sr. ("Salemme"), while instructing DeLuca on how best to bury DiSarro's body, told him that Weadick was "the one that took Steve DiSarro to the house" and that while Frank Jr. was strangling DiSarro, Weadick was "holding him by the legs." [ECF No. 360 at 117:14–123:16]. DeLuca further testified that, some time later, when he and Salemme were incarcerated together, Salemme reported that Weadick had been interviewed by the authorities, and Salemme expressed to DeLuca confidence in Weadick, saying, "he's okay, he'll stand," which DeLuca took to mean Weadick would not talk about the murder. [Id. at 124:3–17].

As relevant to the Petition, also included among the evidence the Government presented at trial was the testimony of Petitioner's former girlfriend, Lara Eldridge. [ECF No. 374 at 53–148 ("Eldridge Trial Tr.")]. She testified that she started working as a dancer at DiSarro's club, the Channel, a few months before Frank Jr. was placed on permanent house arrest, [id. at 57:18–58:17], which the parties stipulated occurred on March 24, 1993, [Opp. at 6 (citing Eldridge Trial

---

[1] Facts relevant to this motion are discussed infra. For a fuller recitation of the facts and the evidence against Petitioner, refer to the First Circuit's opinion in Petitioner's direct appeal. United States v. Weadick, 15 F.4th 1, 7–8 (1st Cir. 2021).

2

Tr. at 58); ECF No. 181 (stipulation)]. She further testified that she started dating Petitioner soon thereafter, [Eldridge Trial Tr. at 58:15–17], and that they dated for approximately a year, ending early in 1994, when she was twenty-one years old, [Eldridge Trial Tr. 56:19–21, 72:25–73:1, 75:4–11, 114:16–18]. During that time, the two were living together at an apartment they rented in Burlington, Massachusetts. [Id. at 56:22–25].

Eldridge further testified that she had overheard Petitioner and Frank Jr. expressing concerns that DiSarro "had a big mouth" and "was talking about things he shouldn't be" before his murder, [Eldridge Trial Tr. at 64:5–17], and that the two of them "wanted to talk to [DiSarro] and meet with him," but DiSarro would not meet with them because "he was afraid he was going to be killed," [id. at 64:20–65:24]. Eldridge then testified that, around the time DiSarro disappeared, Petitioner came home "very, very, very agitated," gave Eldridge a man's gold bracelet (which he implied was DiSarro's), and told her that she "wouldn't have to worry about seeing [DiSarro] ever again." [Id. at 69:13–70:16, 72:16–18]. At some point thereafter, Petitioner took Eldridge for a drive south of Boston and told her that a location they passed would be "a good place to bury somebody," further commenting that "you'd want to bring a body across the state line because you'd end up in federal prison as opposed to state." [Id. at 71:3–72:15].

Crowe conducted Eldridge's cross-examination, which lasted for approximately two hours. See [Eldridge Trial Tr. at 81:5; 146:24–147:3]. Crowe cross-examined Eldridge on a number of issues, including, as relevant here, her inconsistent statements regarding when and where she met Petitioner, [id. at 94:7–95:13, 96:11–20 (inconsistent prior statements regarding whether the club where Eldridge met Petitioner was called "the Channel" or "Soiree" at the time she started working there); 96:21–97:10 (inconsistent prior statements regarding what year

3

Eldridge met Petitioner)]; how long they dated, [id. at 98:4–8 (Eldridge grand jury testimony stating they dated for three years); 99:23–100:25 (Eldridge statement to FBI that she dated Petitioner for eight months); 114:4–10 (Eldridge grand jury testimony that she stopped seeing Petitioner in 1993)]; and where precisely they went for a drive south of Boston, [id. at 115:2–130:14 (conflicting testimony as to whether Eldridge was certain if they drove to Rhode Island or Cape Cod)].

On June 22, 2018, the jury convicted Petitioner of the sole count in the indictment, murder of a witness. [ECF No. 282]. He was sentenced to life in prison. [ECF No. 312]. Petitioner filed a notice of appeal on September 18, 2018. [ECF No. 319]. With Shea serving as appellate counsel, Petitioner challenged his conviction on several grounds, including that "by trying him jointly with Salemme and then introducing evidence covering three decades of crimes by Salemme, the government deprived him of a fair trial." Weadick, 15 F.4th at 7. On September 24, 2021, the First Circuit affirmed his conviction. Id. at 20.

B.      **Procedural Background**

On April 21, 2023, Petitioner, proceeding pro se, filed a motion to vacate his sentence under 28 U.S.C. § 2255 on two grounds: (1) that his counsel, in particular Crowe, provided ineffective assistance; and (2) that the Government's use of witnesses "it knew or should have known were lying" deprived him of due process. [ECF No. 422-2]. Shea filed an affidavit in support of the Petition on May 1, 2023. [ECF No. 426]. Pursuant to the Court's Service Order and various extensions, [ECF Nos. 423, 427, 429], the Government filed its opposition on July 18, 2023, [ECF No. 432]. Petitioner was afforded an opportunity to submit an additional reply in support of the Petition, [ECF No. 434], which he did on September 12, 2023, [ECF No. 436].

## II.     LEGAL STANDARD

Under 28 U.S.C. § 2255(a), individuals in federal custody can move the sentencing court to vacate, set aside, or correct their sentence if: 1) "the sentence was imposed in violation of the Constitution or laws of the United States"; 2) "the court was without jurisdiction to impose such sentence"; 3) "the sentence was in excess of the maximum authorized by law"; or 4) the sentence "is otherwise subject to collateral attack."  28 U.S.C. § 2255(a); David v. United States, 134 F.3d 470, 474 (1st Cir. 1998) (citing 28 U.S.C. § 2255).

> The catch-all fourth category includes only assignments of error that reveal "fundamental defect[s]" which, if uncorrected, will "result[ ] in a complete miscarriage of justice," or irregularities that are "inconsistent with the rudimentary demands of fair procedure."  In other words, apart from claims of constitutional or jurisdictional nature, a cognizable section 2255 claim must reveal "exceptional circumstances" that make the need for redress evident.

David, 134 F.3d at 474 (citation omitted) (quoting Hill v. United States, 368 U.S. 424, 428 (1962)).

While the petitioner has the burden to show he is entitled to relief under § 2255, David, 134 F.3d at 474, "[p]ro se habeas petitions normally should be construed liberally in petitioner's favor," United States v. Ciampi, 419 F.3d 20, 24 (1st Cir. 2005) (citing Estelle v. Gamble, 429 U.S. 97, 106 (1976)).

"Evidentiary hearings on § 2255 petitions are the exception, not the norm," and the petitioner bears "a heavy burden . . . to demonstrate that an evidentiary hearing is warranted." Moreno-Morales v. United States, 334 F.3d 140, 145 (1st Cir. 2003).  A court need not hold an evidentiary hearing if the petition "(1) is inadequate on its face, or (2) although facially adequate, is conclusively refuted as to the alleged facts by the files and records of the case."  Id. (quoting United States v. DiCarlo, 575 F.2d 952, 954 (1st Cir. 1978)).  Because the record in this case

demonstrates that all of Petitioner's claims lack merit, the Court declines to hold an evidentiary hearing.

III. DISCUSSION

    A. **Ineffective Assistance of Counsel**

Petitioner's primary grounds for resentencing and/or vacatur relate to alleged ineffective assistance on the part of counsel. His claims largely center around his counsel's treatment of Eldridge, arguing that counsel 1) failed to investigate and call witnesses to show that Eldridge and Petitioner met and moved in together after the murder, [2] and 2) performed a deficient cross-examination of Eldridge. [ECF No. 422-2 at 2, 5–7, 10–22]; [ECF No. 422-3 at 15–17].

Strickland v. Washington, 466 U.S. 668 (1984) established the standard to be applied in determining whether counsel's assistance violated the Sixth Amendment. To succeed under Strickland, a petitioner must show that "(1) 'counsel's representation fell below an objective standard of reasonableness' and (2) 'a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.'" Knight v.

---

[2] Although the thrust of the Petition focuses on Crowe's cross-examination of Eldridge, Petitioner also appears to argue that his counsel was ineffective in cross-examining the Government's other key witnesses against him—namely, Stephen Flemmi and Robert DeLuca. [ECF No. 422-3 at 19–23 (arguing his attorneys "failed to subject the Government's case to the crucible of meaningful adversarial testimony" and that "[t]he Government's case against [Petitioner] consisted entirely of the testimony of three (3) incentivized witnesses," Flemmi, DeLuca, and Eldridge)]. Petitioner, however, provides no factual support for the contention that counsels' cross-examinations of those witnesses were in any way deficient, nor does he point to any avenues of cross-examination that he thinks should have been explored but were not. Flemmi was subject to almost four days of cross-examination, [ECF Nos. 370–71, 373–74], and DeLuca was subject to approximately two days of cross-examination, [ECF Nos. 360, 362, 366]. Moreover, Shea cross-examined DeLuca, and the Petition, while replete with criticisms of Crowe's cross-examination skills, is devoid of any similar criticism of Shea. See generally [Petition]. The Court's review of the cross-examinations reveals nothing to indicate that counsels' performance was unreasonable or caused Petitioner any prejudice. Thus, Petitioner's claims regarding the Flemmi and DeLuca cross-examinations are not grounds for granting his petition. Strickland, 466 U.S. at 684.

Spencer, 447 F.3d 6, 15 (1st Cir. 2006) (quoting Smiley v. Maloney, 422 F.3d 17, 20 (1st Cir. 2005) (quoting Strickland, 466 U.S. at 684)). The Supreme Court has repeatedly stressed that "[s]urmounting Strickland's high bar is never an easy task." Padilla v. Kentucky, 559 U.S. 356, 371 (2010); see also Harrington v. Richter, 562 U.S. 86, 105 (2011).

Under the Strickland standard, "[d]efense counsel is allowed to make strategic decisions, within the wide bounds of professional competence, as to which leads to follow up, and on which areas to focus his [or her] energies. This is especially true during trial, when time is short." Phoenix v. Matesanz, 233 F.3d 77, 84 (1st Cir. 2000); Strickland, 466 U.S. at 689 ("Because of the difficulties inherent in making the evaluation, a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance . . . ."). "[C]ounsel . . . is not required to pursue every path until it bears fruit or until all available hope withers." Genius v. Pepe, 147 F.3d 64, 67 (1st Cir. 1998) (quoting Solomon v. Kemp, 735 F.2d 395, 402 (11th Cir. 1984)). The First Circuit has explained, for example, that it "will find deficient performance '[o]nly when counsel's strategy was "so patently unreasonable that no competent attorney would have made it."'" Casey v. United States, 100 F.4th 34, 42 (1st Cir. 2024) (quoting Watson v. United States, 37 F.4th 22, 28 (1st Cir. 2022) (quoting Tevlin v. Spencer, 621 F.3d 59, 66 (1st Cir. 2010))). In sum, the bipartite Strickland test is broadly deferential to the decisions of trial counsel. Strickland, 466 U.S. at 689.

### 1. Failure to Investigate and to Call Favorable Witnesses

Petitioner first argues that his counsel was ineffective for failing to investigate when precisely he met Eldridge—which he contends was one month *after* DiSarro went missing—and, pursuant to that investigation, to identify and call witnesses who would rebut Eldridge's timeline. [ECF No. 422-2 at 5–7]; [ECF No. 422-3 at 15]. Specifically, Petitioner contends that "he

7

explained [to counsel] that he didn't meet Ms. Eldridge until in or around June of 1993," "that it wasn't until around July of 1993 that they moved in together," that "his and Ms. Eldridge's relationship and living arrangements were short lived . . . [lasting] [a]pproximately three months," and that "she moved out in or around October of 1993." [ECF No. 422-2 at 5–6]. Because of this, Petitioner "requested that his Counsel look into—prior to his trial—hiring a private investigator, to corroborate what he was saying . . . For example, housing, employment, driving, educational, and other records of himself, and Ms. Eldridge, among others." [Id. at 6]. He further suggested his counsel subpoena two witnesses who he believed could testify that Eldridge "was lying about when she came into [Petitioner's] life." [Id.]. The Government responds that while Petitioner "blames defense counsel for failing to demonstrate that [Petitioner] met Eldridge in June 1993, after DiSarro's disappearance in May 1993, [] there is simply no evidence that this claim is true." [Opp. at 5].

Petitioner's assertions that Counsel failed to adequately investigate are unpersuasive. Trial counsel "'has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary.' But this duty does not invariably require a lawyer, at all times and under all circumstances, to probe every evidentiary lead." Janosky v. St. Amand, 594 F.3d 39, 49 (1st Cir. 2010) (quoting Strickland, 466 U.S. at 691)). "[A] decision to eschew investigation 'must be directly assessed for reasonableness in all the circumstances, applying a heavy measure of deference to counsel's judgments.'" Id. (quoting Strickland, 466 U.S. at 691).

Petitioner concedes that his counsel did, in fact, hire a private investigator and that, despite this, counsel had "essentially nothing to adequately defend [Petitioner], especially against Ms. Eldridge's false allegations." [ECF No. 422-2 at 6]. Moreover, Petitioner concedes that

8

Crowe contacted the two witnesses that Petitioner identified as having specific knowledge that could refute Eldridge's timeline, both of whom informed Crowe that "it was a really long time ago, and that they really didn't remember anything." [Id.]. While counsel certainly could have made the decision to subpoena the two witnesses and/or continue the hunt for the types of records Petitioner identifies, there is no indication that the witnesses would have recalled more information under oath or that the documentary records, if they existed at all, would have corroborated Petitioner's recollection. This is particularly true given that, by the time trial occurred, twenty-five years had passed since the incidents in question, potentially making records difficult to find and limiting witness recollections. Absent any indication that further action would have borne fruit, counsel's decision to eschew further fact investigation on this issue to instead focus on cross-examining Eldridge as to her many inconsistent statements, detailed further infra, falls "within the wide range of reasonable professional assistance" expected of defense counsel. Strickland, 466 U.S. at 689. Thus, the Court declines to grant Petitioner's motion on the ground that his Counsel failed to conduct an appropriate pretrial investigation or call additional witnesses.

### 2. Failure to Effectively Cross-Examine Prosecution Witnesses

Petitioner next argues that Crowe was ineffective in his cross-examination of Eldridge. Petitioner contends that Crowe "did a terrible job" cross-examining Eldridge on key issues, including when precisely Eldridge met Petitioner, when they moved in together, how long they dated, and her prior inconsistent statements on those issues. [ECF No. 422-2 at 10–14]. In his affidavit in support of the Petition, attorney Shea asserts that, during Eldridge's cross-examination, Crowe was "not well organized" and would often "pause and search for his place,"

9

which had the "effect" of making him appear lost. [ECF No. 426 ¶ 7].[3] Both Petitioner and Shea assert that Crowe's performance was so deficient that Petitioner lost confidence in him, [id. ¶ 6; ECF No. 422-3 at 16], and Shea contends that "if Mr. Crowe had been organized and effective, Ms. Eldridge would have been neutralized or discredited," [ECF No. 426 ¶ 9].

    The Government counters that Crowe "conducted a long and thorough cross-examination of Eldridge . . . [which] covered wide-ranging topics including Eldridge's marriages and romantic partners; periods when she lived in Massachusetts; her work as a semi-nude dancer or stripper; whether the club where she worked was called the Channel or Soiree; her prior testimony that she met [Petitioner] in 1991 not 1993; her contacts with [Petitioner] after the relationship ended; her statements to various FBI agents; her description to law enforcement of the burial site; and money she received from the FBI." [Opp. at 6 (citing ECF No. 380)]. The Government further responds that Petitioner's claim that counsel "should have done more to discredit or disprove Eldridge's testimony is wholly speculative—neither [Petitioner] nor Shea

---

[3] Petitioner and Shea both also take issue with the fact that Crowe failed to share discovery about Eldridge with Shea until Eldridge took the stand under the mistaken belief that this Court's prior protective order extended to Shea as co-counsel. [ECF No. 426 ¶ 8]; see also [ECF No. 422-2 at 21–22]. Neither Petitioner nor Shea explains, however, how Crowe's misunderstanding of this Court's protective order, assuming that such a misunderstanding even existed, rises to the level of ineffective assistance. Even presuming that Crowe's decision not to share the discovery materials with Shea earlier was objectively unreasonable, and the Court is not certain that it was, it is difficult to see how Petitioner was prejudiced by this misunderstanding given that both Petitioner and Shea make clear that Crowe was in charge of the Eldridge cross-examination, not Shea, and Crowe had full access to all the relevant materials at all times. [ECF No. 422-3 at 16]; [ECF No. 426 ¶ 3]. To the extent Petitioner's argument is that Shea would have sought further records to bolster the cross-examination if he knew about Crowe's alleged limited approach to discovery, this is belied by the Petition, which describes Shea as fully aware of and at times disagreeing with Crowe's approach to Eldridge-related discovery. See [ECF No. 422-3 at 16 (stating that when Petitioner "complained" about Crowe's decision not to subpoena the two witnesses Petitioner had identified, Shea "said 'I know,' as if indicating that he also did not agree with Mr. Crowe's handling of this situation—and that's not the only thing that these attorneys didn't agree on about this case")].

can identify an actual piece of evidence or area of cross-examination that should have been explored." [Id. at 6–7].

The Court's recollection of the trial and independent review of the transcript do not support Petitioner's contention that Crowe "did a terrible job" cross-examining Eldridge or that he was so "disorganized" as to appear "lost."[4]  Crowe, over the course of two hours, thoroughly impeached Eldridge, ultimately getting her to admit on the stand that she had previously made inconsistent statements, either under oath or to the FBI, regarding when and where she met Petitioner, when they moved in together, and how long they dated.  [Eldridge Trial Tr. at 94:7–95:13, 96:11–20 (inconsistent statements regarding whether the club where Eldridge met Petitioner was called "the Channel" or "Soiree" at the time); 96:21–97:15 (inconsistent prior statements on what year Eldridge met Petitioner); 98:4–8 (Eldridge grand jury testimony stating she dated Petitioner for three years); 99:23–100:25 (Eldridge statement to FBI that she dated Petitioner for eight months); 114:4–10 (Eldridge grand jury testimony that she stopped seeing Petitioner in 1993)].  The fact that the jury chose to find her credible despite these inconsistencies in her timeline is well within their province.  See United States v. Rodriguez, 457 F.3d 109, 119 (1st Cir. 2006) (inconsistencies in witness testimony and questions arising from conflicting details "were all proper matters for the jury to evaluate in determining witness credibility and the overall strength of the evidence").  Counsel's performance easily clears the bar of an "objective standard of reasonableness." Strickland, 466 U.S. at 687–88

To the extent Petitioner's claim is that Crowe could have been more aggressive in obtaining further admissions on these issues, Crowe's choice not to push the witness after a point

---

[4] Having sat through the whole trial, it was and remains the Court's belief that Petitioner was ably represented throughout.

11

can reasonably be characterized as trial strategy. Eldridge was emotional during her testimony,[5] and, as a result, Crowe may have maintained reservations regarding how a more confrontational approach would have been regarded by the jury, including whether it could have come across as bullying the only female witness. Such strategic trial decisions "are virtually unchallengeable," and the Court sees no reason to question the strategy here, where Crowe succeeded in obtaining many helpful admissions. Strickland, 466 U.S. at 690; Sleeper v. Spencer, 510 F.3d 32, 38 (1st Cir. 2007) (quoting Yarborough v. Gentry, 540 U.S. 1, 5–6 (2003)) (stating that counsel "has 'wide latitude in deciding how best to represent a client'").[6]

Even if Petitioner had met his burden to show that Crowe's cross-examination was objectively unreasonable, he would also need to show prejudice, which he has not done. "Where, as here, a petitioner asserts that counsel failed to introduce evidence or challenge the

---

[5] Per the Court's recollection, Eldridge was visibly anxious during her testimony. The transcript also reflects that Eldridge asked for tissues during her testimony and told the Court that she did not like testifying about her private life, and her counsel admitted at sidebar that Elbridge was "paranoid" about her own safety. [Eldridge Trial Tr. 57:21–22 (asking for tissues); 84:25–85:5 (telling the Court she did not like talking about her private life); 87:12–20 (sidebar conversation about safety)].

[6] Petitioner makes one additional argument in support of his ineffective assistance claim regarding Eldridge's cross-examination, which is that his counsel "stipulated to limiting the cross-examination of Ms. Eldridge without first discussing it with him." [ECF No. 422-2 at 21]. Counsel did not agree to limit her cross-examination; rather, they agreed with the Government to a schedule that would permit Eldridge to testify when she was available. Specifically, at the end of the trial day on Monday, June 11, 2018, the Government informed the Court that Eldridge would not be available on Wednesday, June 13, 2018. [ECF No. 373 at 156:24–157:8]. Eldridge was scheduled to testify after Flemmi, whose redirect was still ongoing at that time. [Id. at 157:3–158:19]. The Government proposed pausing Flemmi's testimony to put Eldridge on the stand the next day, Tuesday, June 12, 2018. [Id. at 175:1–3]. Shea objected to this proposal on the grounds that it prejudiced the defense. [Id. at 158:22–159:3]. The Court told the parties to agree on a schedule, and in the end, defense counsel agreed to finish Eldridge's testimony on Tuesday when she was available. Consequently, Crowe's cross-examination of Eldridge was limited to two hours. While it would have been prudent for defense counsel to have discussed this with their client, the Court cannot say that agreeing to this schedule as an alternative to one which counsel believed would have prejudiced Petitioner was so unreasonable as to constitute ineffective assistance.

12

credibility of government witnesses on cross-examination, [the First Circuit] consider[s] three factors: 'first, the strength of the prosecution's case; second, the effectiveness of the defense that was presented at trial; third, the potential value of the new evidence and new avenues for cross-examination in undermining the credibility of the government witnesses' testimony.'" Turner v. United States, 699 F.3d 578, 584 (1st Cir. 2012) (quoting Dugas v. Coplan, 506 F.3d 1, 9 (1st Cir. 2007)). Although certainly important, Eldridge was just one of many witnesses to testify against Petitioner, and the prosecution would have presented a strong case even without her testimony. For instance, Eldridge did not provide eyewitness testimony placing Petitioner at the scene of the murder, nor was her testimony the only corroboration that he participated in the murder. As the Government explains, "the strongest evidence of [Petitioner's] guilt was the eyewitness testimony of Stevie Flemmi, who personally saw [Petitioner] pick DiSarro up by the legs while Frank Jr. strangled DiSarro," and Flemmi's eyewitness account "was also corroborated by Robert DeLuca." [Opp. at 8–9]. While Petitioner contends that Eldridge's testimony was crucial to corroborating these "incentivized" witnesses, [ECF No. 422-2 at 17], their testimony, standing alone, supports his conviction.

That said, even if the first factor weighed in Petitioner's favor, the second and third factors weigh against him. The trial transcripts make clear that counsel adequately and effectively called not just Eldridge's credibility into question but also Flemmi's and DeLuca's, [ECF Nos. 360, 362, 366, 370–71, 373–74], and Petitioner has not pointed to any additional avenues of impeachment which would have added material value to his defense, see generally [Petition]. Because Petitioner has not demonstrated that Crowe's cross-examination of Eldridge was objectively unreasonable or that it caused him any prejudice, it is not grounds to grant his Petition.

### B. Government's Use of Witnesses Who Were Lying

In his Petition, Petitioner asserts an alternative ground for relief: "The government's use of witness(es) it knew or should have known were lying deprived [petitioner] of due process, and a fair trial." [ECF No. 422-2 at 2]. Petitioner provides no factual support, however, for the contention that the Government knew or otherwise should have known that any witness was lying. See generally [Petition]. Without further explanation of the basis for this claim, the Court declines to grant Petitioner's motion on these grounds.

### IV. CONCLUSION

Accordingly, the Petition, [ECF No. 422], is **DENIED**.

**SO ORDERED.**

April 18, 2025                                  /s/ *Allison D. Burroughs*
                                                ALLISON D. BURROUGHS
                                                U.S. DISTRICT JUDGE